**CARPETMASTER OF LATHAM, LTD., Plaintiff,**

v.

**DUPONT FLOORING SYSTEMS, INC. and Ronald Cassin, individually and in his capacity as Vice–President of Dupont Flooring Systems, Inc., Defendants.**

No. 97–CV–1807.

United States District Court, N.D. New York.

June 15, 1998.

Whitman, Osterman & Hanna, Albany, NY, for plaintiff, Jean F. Gerbini, Neil L. Levine, of counsel.

Phillips, Lytle, Hitchcock, Blaine & Huber, Rochester, NY, for defendants, Mark J. Moretti, of counsel.

## MEMORANDUM–DECISION and ORDER

McAVOY, Chief Judge.

Presently before the Court are objections submitted by plaintiff CarpetMaster of Latham, Ltd. ("CarpetMaster") to the Report–Recommendation of United States Magistrate Judge Gary L. Sharpe, which recommends that defendant Dupont Flooring Systems' ("Dupont") motion to dissolve a state court temporary restraining order be granted and that Plaintiff's motion for a preliminary injunction be denied.

## I. BACKGROUND

The facts of this case are fully stated in Judge Sharpe's February 10, 1998 Report–Recommendation and April 23, 1998 Order and Report–Recommendation which are attached hereto as appendices. Familiarity with these facts is assumed.

In summary, CarpetMaster and Dupont are competitors in the sale and installation of carpeting in the Albany area. In October 1996, defendant Ronald Cassin approached CarpetMaster's President, Robert Taylor, concerning the purchase of CarpetMaster's commercial carpeting division. On October 23, 1996, CarpetMaster and M.S.A. § Industries, a carpeting company purchased by Dupont, executed an agreement ("Confidentiality Agreement") that required the parties to exchange confidential and proprietary information to be used exclusively for acquisition evaluations. The acquisition negotiations ultimately broke down.

On November 14, 1997, CarpetMaster filed suit in New York State Supreme Court alleging breach of contract, misappropriation of trade secrets, tortious interference with business relations, and fraud, all arising from the failed negotiations for its purchase by Dupont. In essence, CarpetMaster alleges that Dupont violated the Confidentiality Agreement by disclosing proprietary information to Cassin and that Cassin used that information to steal CarpetMaster's subcontractors, employees, and customers.

In the state court proceeding CarpetMaster obtained a Temporary Restraining Order ("TRO") preventing Dupont from engaging in certain business practices. Dupont removed the action to this Court and moved to dissolve the TRO. Pursuant to 28 U.S.C. section 636(b) and Local Rule 72.3(c) the Court referred the instant dispute to the Honorable Gary L. Sharpe, United States Magistrate Judge, for a report and recommendation.

Judge Sharpe conducted a hearing and afforded both parties the opportunity to present witness, which they declined, instead relying on affidavits and oral argument. Judge Sharpe issued a Report–Recommendation on February 10, 1998, finding: "[Carpet-

Master] failed to sustain its burden of persuading this court that it will suffer non-compensatory, irreparable harm, including loss of goodwill. So too, CarpetMaster has failed to demonstrate either a likelihood of success on the merits or serious questions going to the merits." February 10, 1998 Report–Recommendation (hereinafter "First R & R") at 3.

CarpetMaster filed timely objections as well as additional evidence that convinced this Court to refer the matter to Judge Sharpe for reconsideration of his February 10, 1998 Report–Recommendation. On March 13 and 16, 1998, Judge Sharpe conducted an evidentiary hearing, taking testimony from three witness. On April 23, 1998, Judge Sharpe issued a second report-recommendation, stating "the court fails to find anything new in CarpetMaster's evidence and again recommends that the TRO be dissolved and a preliminary injunction denied." April 23, 1998 Order and Report–Recommendation (hereinafter "Second R & R") at 12. CarpetMaster again filed timely objections.

## II. DISCUSSION

### A. Standard of Review

Under Federal Rule of Civil Procedure 72(b) and 28 U.S.C. section 636(b)(1)(A), a district court evaluating a magistrate judge's recommendation is permitted to adopt those portions of the recommendation to which no "specific, written objection" is made, as long as those sections are not clearly erroneous. *See, e.g., Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 471–72, 88 L.Ed.2d 435 (1985); *Greene v. WCI Holdings Corp.,* 956 F.Supp. 509, 513 (S.D.N.Y.1997), *aff'd,* 136 F.3d 313 (2d Cir.1998). Where a party makes a "specific written objection," the district court is required to make a de novo determination regarding those parts of the report to which objection is made. *See, e.g., United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 2412–13, 65 L.Ed.2d 424 (1980); *Ehinger v. Miller,* 942 F.Supp. 925, 927 (S.D.N.Y.1996).

A *de novo* determination entails an independent review of all objections and responses to the magistrate's findings and recommendations. *See, e.g., United States v. Tortora,* 30 F.3d 334, 337 (2d Cir.1994); *Bristol–Myers Squibb Co. v. McNeil–P.P.C.,* 973 F.2d 1033, 1045 (2d Cir.1992). When objections are filed a district court is not, however, required to ignore the magistrate judge's recommendations. As Judge Spatt has noted, "[b]y using the phrase de novo determination ... rather than *de novo* hearing, Congress intended 'to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.'" *U.S. v. Ten Cartons Ener–B Nasal Gel,* 888 F.Supp. 381, 390 (E.D.N.Y.), *aff'd,* 72 F.3d 285 (2d Cir.1995) (quoting *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir. 1989) (quoting *Raddatz,* 100 S.Ct. at 2412)). Thus, the statute does not require a district court rehear the contested testimony in order to make its determination. *Id.; Grassia,* 892 F.2d at 19.

Here, Plaintiff has filed objections. Consequently, the Court reviews *de novo* those portions of Judge Sharpe's Report–Recommendation to which Plaintiff has objected. *See* 28 U.S.C. § 636(b)(1).

### B. Plaintiff's Objections

In both his First and Second R & R, Judge Sharpe recommended that the TRO be dissolved and that Plaintiff's request for a preliminary injunction be denied. Plaintiff's objections essentially focus on two aspects central to Judge Sharpe's findings. First, Plaintiff argues that in hiring two of CarpetMaster's key employees, Dupont acquired protected trade secrets. Second, Plaintiff argues that because trade secrets are involved, irreparable harm is presumed.

In this circuit the standard for obtaining a preliminary injunction is well established. In order to obtain a preliminary injunction the movant must make an affirmative showing of: (1) irreparable harm; and either (2) likelihood of success on the merits; or (3) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant. *See, e.g., Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir. 1992); *Resolution Trust Corp. v. Elman,* 949

F.2d 624, 626 (2d Cir.1991); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

### i. Trade Secret Protection

Plaintiff argues that in hiring two of CarpetMaster's key employees, Wes Moller and Gus Franze, Dupont acquired access to trade secrets involving (1) costs, products, and prices included in customer budgeting and proposal processes in which Moller and Franze were involved, and (2) the identity, source, and price of certain "CarpetOne" trademarked floorcovering products sold by CarpetMaster. Judge Sharpe rejected both of Plaintiff's trade secret allegations.

■ To recover for the misappropriation of a trade secret Plaintiff must demonstrate (i) that it possessed a trade secret and (ii) that Defendant used that trade secret in breach of an agreement, a confidential relationship or duty, or as a result of discovery by improper means. *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir.1990); *Speedry Chemical Products, Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir.1962). Under New York law, "a trade secret 'may consist of any formula, pattern, device or compilation of information [that] is used in one's business, and [that] gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1176 (2d Cir.1993) (quoting Restatement of Torts § 757 cmt. b (1939)); *see also Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 485 N.Y.S.2d 143, 144 (3d Dept. 1985); *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 297 (2d Cir.1986); *Support Sys. Assocs. v. Tavolacci*, 135 A.D.2d 704, 522 N.Y.S.2d 604, 606 (2d Dept. 1987). In determining whether a trade secret exists, courts have considered the following factors:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs.*, 920 F.2d at 173 (citing *Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 453 N.Y.S.2d 470, 472 (4th Dept. 1982)).

### (1) Costs, Products, Prices, and General Business Information

Plaintiff argues that by hiring Moller and Franze, Dupont obtained trade secret information about proposals CarpetMaster prepared for customers during Moller and Franze's employment.

■ Although compilations of business information such as customer and supplier lists, pricing, and cost information may be protected, *see Hudson Hotels Corp.*, 995 F.2d at 1176, "[a]n employee is entitled to learn the ordinary operation of a business in the course of his employment, and will not be enjoined from putting such knowledge to subsequent use where there is nothing secret, confidential, or unusual about it." 104 N.Y.Jur.2d *Trade Regulation* § 250 (1992). Solicitation of an employer's customers by a former employee is not actionable unless the information used is "considered a trade secret or there was wrongful conduct by the employee such as physically taking or copying the employer's files or using confidential information." *Amana Exp. Int'l, Inc. v. Pier–Air Intern., Ltd.*, 211 A.D.2d 606, 621 N.Y.S.2d 108, 109 (2d Dept. 1995).

■ Here, CarpetMaster alleges that Moller and Franze were intimately involved with the budgeting process in connection with generating bid proposals for CarpetMaster. Thus, through an exchange of information with a potential customer they would identify and recommend specific products, obtain costs from the manufacturer, and decide a price for the customer. According to CarpetMaster, this information is entitled to trade secret protection.

While the Court agrees with Plaintiff that this information has competitive value, it does not necessarily follow that this information is entitled to trade secret protection. In

fact, the facts militate against such a finding. First, CarpetMaster appears to have taken no measures to guard the secrecy of this information. *See, e.g., Delta Filter Corp. v. Morin,* 108 A.D.2d 991, 485 N.Y.S.2d 143, 144 (3d Dept. 1985) ("An essential requisite to legal protection against misappropriation of such a formula, process, device or compilation of information is the element of secrecy.").

■ Second, there is no evidence that Franze or Moller ever copied, intentionally memorized, or stole this information. *See, e.g., Levine v. Bochner,* 132 A.D.2d 532, 517 N.Y.S.2d 270, 271 (2d Dept. 1987) ("The use of information about an employer's customers which is based on casual memory is not actionable."). An employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential. *Walter Karl, Inc. v. Wood,* 137 A.D.2d 22, 528 N.Y.S.2d 94, 98 (2d Dept. 1988).

Finally, this is the type of information that can easily be acquired or duplicated by others. *See Great Lakes Carbon Corp. v. Koch Indus., Inc.,* 497 F.Supp. 462, 470 (S.D.N.Y. 1980) ("price and cost estimates ... are not 'trade secrets' or protected confidences"). As New York courts have noted:

> [Pricing and estimating] is a matter of experience, knowledge of the business, and judgment. The factors to be considered in making estimates are fundamental—inside costs, outside costs, overhead, and profit. The amount of money making up each factor necessarily fluctuates with the market. There is nothing secret in the decision of how much of a mark-up percentage is necessary for a good profit.

*Richard M. Krause, Inc. v. Gardner,* 99 N.Y.S.2d 592, 595 (N.Y.Sup.Ct.1950). Similarly, as to customer lists, trade secret protection "will not attach to customer lists where such customers are readily ascertainable from sources outside the former employee's business unless the employee had stolen or memorized the customer lists." *WMW Machinery Co., Inc. v. Koerber AG,* 240 A.D.2d 400, 658 N.Y.S.2d 385, 387 (2d Dept. 1997); *see also Amana,* 621 N.Y.S.2d at 109.

For the foregoing reasons, the Court concludes that Plaintiff has not met its burden of demonstrating that its costs, prices, budgeting, and general business information are entitled to trade secret protection.

### (2) CarpetOne Information

■ CarpetMaster also alleges that Moller and Franze brought to Dupont detailed knowledge of CarpetMaster's CarpetOne labeled products. In essence, the CarpetOne program packages a number of popular carpet styles in such a way that it is difficult for competitors to ascertain the precise color and type identification or who manufactured the carpet. Robert Taylor, CarpetMaster's President, states the value of this "inside information" as follows:

> The carpet merchant who can pull an exact match out of tens of thousands of floor covering products available on the market today has a tremendous edge over his competitor.... For precisely these reasons, CarpetMaster and other members of the Carpet Co–Op of America Association expended considerable money and resources selecting and advertising carpet products to be sold exclusively through Co–Op members.... [T]he Co–Op made efforts to protect the identities of the sources (and pricing structures) of those products by labeling them with the exclusive CarpetOne names, trademark and related marks.

(Taylor Aff., ¶¶ 8–10).

As the Court previously stated, there are a number of factors courts use in determining whether a trade secret exists. *See Integrated Cash Mgmt. Servs.,* 920 F.2d at 173. After careful review of the record, the Court finds these factors weigh in favor of Plaintiff.

First, the extent of measures taken by CarpetMaster and Carpet Co–Op of America Association ("Co–Op") to guard the secrecy of the information favors CarpetMaster. According to Taylor, the Co–Op protects the identity of its sources by relabeling them with exclusive names and related marks. Howard Brodsky, Co–Chairman of Carpet Co–Op, states: "The specifications, source and pricing of Carpet One product are closely-guarded trade secrets.... Non-member competitors are not entitled to such informa-

tion." (Brodsky Aff., ¶ 3). By joining the CarpetOne Co–Op program, CarpetMaster agreed to maintain the confidentiality of the CarpetOne product information. (Brodsky Aff., Ex. B).

Second, the value of the information to CarpetMaster and to its competitors is significant. Although Dupont can undoubtedly compete with CarpetMaster without this information, the ability to easily determine the source of popular carpet styles is clearly of value. In support of this point, CarpetMaster submits the transcript from an "undercover operation" it orchestrated to test if Dupont would attempt to match a particular carpeting offered exclusively by CarpetMaster. As the transcript demonstrates, Moller immediately identified the carpet sample's exact specifications and manufacturer. (Taylor Aff., ¶ 17).

Third, CarpetMaster and the Co–Op expend a substantial amount of money in developing the information. For example, CarpetMaster paid $18,000 to the Co–Op for a license to sell CarpetOne products. (Brodsky Aff., Ex. C). The Co–Op "researches the demands for floor covering products among particular groups of retail, commercial, and construction consumers, and shops carpet mills around the world to locate products." (Brodsky Aff., ¶ 2).

Fourth, the ease or difficulty with which the information could be properly acquired or duplicated by others weighs in favor of CarpetMaster. Again the Court notes that although Dupont can compete with CarpetMaster without this "inside" information, it would be time-consuming for Dupont to match CarpetMaster's CarpetOne products without this CarpetOne information. To illustrate, Taylor states that it is difficult to precisely identify CarpetOne products because the particular dyeing processes, gauges, weights, and styles are simply too numerous, and thus the carpet merchant who can pull an exact match out of tens of thousands of floor covering products available on the market has a tremendous edge over his competitor. (Taylor Aff., ¶¶ 9, 16).

The remaining factors, the extent to which the information is known outside of CarpetMaster's business and the extent to which it is known by employees and others involved in its business appear to favor neither party. To gain injunctive relief, however, Plaintiff need not establish this issue as a matter of law. The Court instead holds Plaintiff to a slightly lower standard; Plaintiff must demonstrate either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Covino,* 967 F.2d at 77.

After reviewing the extensive record here, the Court finds that Plaintiff has demonstrated that it is likely to succeed on its claim that CarpetOne product specifications are entitled to trade secret protection.

### ii. Irreparable Harm

■ As this Court recently noted, "[c]ourts in this circuit have repeatedly stated that '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Nakatomi Investments v. City of Schenectady,* 949 F.Supp. 988, 990 (N.D.N.Y.1997) (quoting *Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991)). Irreparable injury, moreover, means injury for which a monetary award cannot be adequate compensation. *Jackson Dairy,* 596 F.2d at 72 (*citing Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir. 1966), *Foundry Services, Inc. v. Beneflux Corp.,* 206 F.2d 214, 216 (2d Cir.1953)).

■ In the present context, however, the law is clear in the Second Circuit that irreparable harm is presumed where a trade secret has been misappropriated. *See, e.g., Inflight Newspapers, Inc. v. Magazines In–Flight, LLC,* 990 F.Supp. 119, 124 (E.D.N.Y.1997); *Computer Assocs. Int'l, Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992). The reason for this presumption is clear, "[a] trade secret once lost is, of course, lost forever" and, as a result, such a loss "cannot be measured in money damages." *FMC Corp. v. Taiwan Tainan Giant Indus. Co. Ltd.,* 730 F.2d 61, 63 (2d Cir.1984).

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dissolve the TRO is GRANTED. Plaintiff's motion for a preliminary injunction is GRANTED IN PART.

The TRO issued in New York state court is DISSOLVED. Defendants, however, are hereby ENJOINED from using or disclosing CarpetOne product specifications during the pendency of this action. All other aspects of Judge Sharpe's February 10, 1998 Report–Recommendation and April 23, 1998 Order and Report–Recommendation are adopted for the reasons stated therein.

**IT IS SO ORDERED.**

### *ORDER AND REPORT– RECOMMENDATION*

SHARPE, United States Magistrate Judge.

### I. *BACKGROUND*

On February 10, 1998, this court issued a report recommending the dissolution of Justice Graffeo's State TRO and the denial of CarpetMaster's request for injunctive relief.[1] On February 25, 1998, Chief Judge McAvoy issued an order adopting the report, but rescinded that order a day later.[2] On March 2, 1998, CarpetMaster filed a response styled "Objections to the Report and Recommendation and Notice of Motion." [3]

According to the response, CarpetMaster: (a) objected to the report and requested that the district court enjoin Dupont from "using or disclosing proprietary information of Car-

petMaster's identifying CarpetMaster's sources of private-labeled floor covering products, CarpetMaster's costs, CarpetMaster's work-in-progress and submitted/unsubmitted quotations for products and services;" [4] and, (b) noticed a motion for April 16, 1998, seeking to (1) reargue and reconsider the report and recommendation because of newly discovered evidence; (2) preclude disclosure of an affidavit, video tape and transcript containing trade secrets, the public disclosure of which would cause irreparable harm; [5] and, (3) sanction Dupont for violations of the State TRO.[6]

On March 3, 1998, Dupont responded and, among other things, complained that CarpetMaster had engaged in *ex parte* communications with the court concerning matters in controversy.[7] On March 4, 1998, CarpetMaster replied, stating that it had not disclosed the videotape, but had disclosed those limited portions of the transcript which it intended to rely on as new evidence. It declined to disclose the tape, affidavit and remainder of the transcript, citing an adverse impact on forthcoming depositions.[8]

On March 5, 1998, the district court issued an order remanding the matter to this court for reconsideration in light of CarpetMaster's new evidence. The order directed that CarpetMaster immediately disclose the *in camera* evidence to Dupont.[9]

On March 9, 1998, this court conducted a status conference, and set the parameters of the remand as follows: the court would review the videotape, transcript and affidavit to

---

1. Familiarity with the court's prior Report and Recommendation (hereinafter, "R & R") is presumed.

2. The report recited the Local Rule and statutory authority limiting CarpetMaster's time to respond, but there was confusion in docketing the report. *See* Docket No. 42, CarpetMaster's February 25, 1998 letter.

3. The response did not comply with Local Rule 72.1(c), but naturally the district court has the discretion to consider any matter *sua sponte*. This court is simply tracing the procedural history to clarify exactly what is before it.

4. Although the phraseology of this request is difficult to decipher in terms of the precise relief requested, it clearly differs from the language of

Justice Graffeo's order and differs yet again from the language proffered during the remand. *cf.* Docket No. 62 quoted, in part, hereinafter at 11.

5. *See* Docket No. 46, CarpetMaster's application for a sealing order filed with their response and attachments.

6. *See* Docket No. 44.

7. *See* Docket No. 47.

8. *See* Docket No. 50.

9. *See* Docket No. 48.

resolve the disclosure issue [10]; the court would reopen the Rule 65(a) hearing to consider the "new evidence;" and, the hearing would be limited to the injunction issues, not sanctions.[11] After reviewing the videotape, transcript and affidavit the same day, the court conducted another conference, and ordered immediate disclosure in compliance with the district court's prior order. The bases for that ruling were as follows: there was nothing new in the videotape that altered the arguments raised during the first hearing; protection of potential deposition impeachment material did not take precedence over the opposition's ability to respond to facts offered as substantive evidence; and, CarpetMaster had altered its original position from one seeking trade secret protection to one seeking the protection of deposition impeachment material.

On March 10, 1998, the court conducted yet another status conference, and scheduled the hearing for March 13, 1998. Responding to the court's concern regarding the length of time the State TRO had been in effect, CarpetMaster indicated that it would limit its witnesses to Moller and Franze.[12] On March 13 and 16, 1998, the court conducted the second hearing, taking testimony from Franze, Moller and Cassin. Despite CarpetMaster's prior representations and over Dupont's objection, the court permitted CarpetMaster to call Cassin as a surprise witness.[13]

Accordingly, the court has considered the testimony at the hearing, the tape and transcript, all hearing exhibits, and numerous affidavits. Based upon that review and for the reasons that follow, the court again recommends that Justice Graffeo's TRO be dissolved and that CarpetMaster's request for injunctive relief be denied.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Since CarpetMaster's position seems to frequently shift, the court begins by summarizing those issues previously decided, CarpetMaster's factual assertions regarding them, and the extent to which they have been altered by any new evidence.

In November 1997, CarpetMaster filed suit alleging breach of contract, tortious interference with business relations, fraud, and misappropriation of trade secrets, all arising from failed negotiations for its purchase by Dupont.[14] During the negotiations, CarpetMaster gave Dupont information that Dupont promised it would disclose only to those involved in the purchase decision. That promise was embodied in a Confidentiality Agreement executed by the parties. CarpetMaster has continuously alleged that Dupont violated that Agreement while Dupont has steadfastly denied having done so. On this remand, CarpetMaster concedes that it has nothing new to offer which demonstrates that Dupont violated that Agreement.

Furthermore, CarpetMaster's complaint and all of its prior affidavits, exhibits and arguments have hung by the thread of its assertion that Dupont violated that Agreement. In other words, it claimed that by violating the Agreement, Dupont breached a contract;[15] by using unlawfully disclosed information to solicit CarpetMaster's customers, Dupont tortiously interfered with business;[16] by using feigned purchase negotiations to obtain Carpetmaster's information, Dupont committed fraud;[17] and, by unlawfully disclosing information which consisted of trade secrets, Dupont misappropriated them.[18] Again, all causes of action

10. On behalf of CarpetMaster, Neil Levine, Esq., stated that he had received permission from the district court to disregard the March 5 disclosure order.

11. The parties were advised that the sanctions issue would remain on this court's April motion calendar.

12. Jean Gerbini, Esq., represented CarpetMaster in this conference.

13. Neil Levine, Esq., represented CarpetMaster at the hearing, not Ms. Gerbini.

14. CarpetMaster Complaint (hereinafter, "CC"), ¶ 1.

15. See CC, ¶¶ 18–26.

16. See CC, ¶¶ 35–41.

17. See CC, ¶¶ 42–49.

18. See CC, ¶¶ 27–34.

hinged on Dupont's having violated the Agreement.

As with the causes of action themselves, the factual allegations in CarpetMaster's complaint focused on the Agreement. The complaint alleges that Dupont gathered confidential and proprietary information and then violated the Confidentiality Agreement by making disclosures to unauthorized personnel. In turn, the unauthorized personnel used the information to "raid ... key employees, to hire away ... key subcontractors, [and to] solicit CarpetMaster's commercial business."[19] CarpetMaster alleged that it disclosed "(d)etailed information concerning the identities of the commercial division's customers, including all details of projects CarpetMaster currently was working on for such customers, such as CarpetMaster's price and profits for such projects, along with details of work under contract for future performance and projects that CarpetMaster was bidding on; and, (d)etailed information concerning CarpetMaster's products, services, prices, costs, profit margins, and other confidential and proprietary, business and financial information."[20] According to CarpetMaster, this information constituted "confidential and proprietary trade secret information."[21] It also alleged that Dupont violated the agreement by unlawfully disclosing secret information to "lure away ... key personnel and subcontractors" and to "compete directly with CarpetMaster, [and] to interfere with CarpetMaster's business relations with its clients ..."[22]

During the first hearing, CarpetMaster made explicit representations to the court concerning its law suit. First of all, it stated that its trade secret claim was premised on "Carpet One" product information supplied to Dupont.[23] In fact, CarpetMaster sought to persuade the court that Carpet One information constituted trade secrets by introduc-

ing evidence concerning backing that was placed on that carpet to preclude competitors from readily identifying its commercial counterpart,[24] by establishing special pricing structures exclusively available through the Carpet Co–Op of America, and by establishing a list of regular customers who exclusively purchased that line. So too, CarpetMaster represented to the court that Moller and Franze were the employees who had been stolen, that the customers who had been stolen were those listed in a Taylor Affidavit,[25] and that the State TRO was too broad insofar as it exceeded the scope of CarpetMaster's representations to the court.

As the court noted, Dupont's flat denial created a direct conflict which could not be resolved on the basis of affidavits offering nothing beyond circumstantial allegations. Accordingly, the court found that CarpetMaster had failed to sustain its burden of proof. In the renewed hearing, CarpetMaster concedes that there is nothing "new" in the evidence that contradicts Dupont's denial that it breached the Confidentiality Agreement. Concession or not, the court has specifically reviewed the tape, transcript, testimony, affidavits and exhibits, and expressly concludes that there is nothing new as a matter of fact which alters the prior Report and Recommendation.

Insofar as the new evidence and other facts offered by CarpetMaster during the second hearing are concerned, the court addresses each cause of action *seriatim*. As to breach of contract, there is no new evidence demonstrating Dupont violated the Confidentiality Agreement and CarpetMaster has again failed to sustain its burden of proof. As to tortious interference with its business, CarpetMaster's complaint relied on allegations that customers were solicited with information generated from violations of the

19.  CC, ¶ 1.

20.  CC, ¶ 7(c)(d).

21.  CC, ¶ 10.

22.  CC, ¶¶ 12–16.

23.  *See* R & R at 4.

24.  All carpeting is manufactured by a limited number of mills. Every Carpet One product has a commercially available twin that may be purchased directly from the mill. The backing is placed on the Carpet One line to limit the ability to identify the mill and, therefore, the commercial alternative.

25.  *See* R & R at 5–6.

Confidentiality Agreement,[26] Dupont's denial continues unabated, there is no new evidence, and CarpetMaster has failed to sustain its burden on this cause of action. As to fraud, since CarpetMaster's allegations hinged on Dupont's having violated the Agreement,[27] there is nothing new, and CarpetMaster has failed to sustain its burden on this cause of action.

CarpetMaster's last cause of action alleges misappropriation of trade secrets. In short, there is nothing new in the evidence that supports the claims made by CarpetMaster in its complaint and during the first hearing.[28] As the court previously noted, Carpet-Master represented to the court that its Carpet One product specifications constituted trade secrets, that Dupont violated the Agreement by using unauthorized information to hire Moller, that Moller was familiar with the Carpet One secrets, and that Dupont had therefore misappropriated those trade secrets. It was precisely this argument that the court addressed in the prior report when it stated:

> The court credits the argument that any commercial customer understands the nature of its own carpeting needs and would be in a position to compare competitors' costs with those needs. Since Dupont cannot sell the Co–Op product, they cannot sell what CarpetMaster supplies. We are not persuaded that the Co–Op specifications which may, or may not, be reposed in the mind of Moller are such that Dupont could not compete with the product line even if there were no alleged unauthorized disclosures. R & R at 9.

The new evidence offered the district court consists of a secretly videotaped negotiation for the purchase of carpeting from Dupont's Moller and Franze by agents of CarpetMaster. On tape, CarpetMaster's agents showed the Dupont employees a Carpet One sample book, and in essence asked about Dupont's ability to supply a specified product. Moller's response was consistent with the court's observation reflected in the section of the prior Report quoted above. Moller told the

agents that he recognized their choice as a Carpet One sample because of his prior employment, that Dupont could not sell them that product, but that Dupont could sell a similar product at a competitive cost. There is absolutely nothing in that tape nor any other evidence submitted by CarpetMaster that suggests Dupont disclosed or used CarpetMaster's trade secrets. Once again, Dupont has failed to sustain its burden of proof.

There is one further aspect of CarpetMaster's current position that causes the court to pause. During the rehearing, CarpetMaster for the first time raised an alternative claim regarding its trade secret cause of action. It now avers that as former employees, Moller and Franze were privy to general business information totally separate and distinct from the Carpet One product line. Since that general information also constitutes trade secrets and although there were no restrictive employment agreements of any kind, Carpet-Master argues that Moller, Franze and Dupont are in violation of New York's common law regarding trade secret protection under this alternative theory. Additionally, and despite contrary representations to the court during the first hearing, CarpetMaster claims that Dupont should be restrained from dealing with all CarpetMaster customers who had any contact with Moller and Franze, not just those listed in the Taylor Affidavit. Furthermore, CarpetMaster now claims that not only should its Carpet One product be protected, but all carpeting of any kind. In short, it insists under its new theory that Moller, Franze and therefore, Dupont, may not compete in the Albany market as long as CarpetMaster previously sold carpet to a customer during the time that Moller and Franze were working there.

When CarpetMaster raised this argument over Dupont's objection, the court thoroughly questioned CarpetMaster's counsel concerning the extent to which this new theory was alleged in the complaint as well as the fact that the theory was inconsistent with prior representations to the court. Nonetheless,

**26.** *See* CC, ¶¶ 35–41.

**27.** *See* CC, ¶¶ 42–49.

**28.** *See* CC, ¶¶ 27–34.

the court permitted CarpetMaster to offer its evidence in this regard.

The gist of CarpetMaster's factual assertions are easily summarized. It claims that as former employees, Moller and Franze were involved in generating numerous bid proposals. Therefore, they were familiar with product recommendations, costs, job specifications and discounts, all of which constituted trade secret information. And accordingly, CarpetMaster is now entitled to a limited injunction as follows:

> 1. Dupont should be enjoined from involvement in projects that Wes Moller and Gus Franze worked on while at Carpet-Master; and, 2. Dupont should be enjoined from selling the commercially available counterparts to CarpetOne products sold by Wes Moller and Gus Franze while at CarpetMaster.[29]

Dupont responded by noting that Moller and Franze left CarpetMaster more than five months ago and in the interim, prices have changed, quotations have inevitably been altered, and project specifications are open to anyone who cares to participate in the bidding process. Furthermore, it noted that CarpetMaster has once again altered the injunctive relief it seeks and has failed to specify what projects would be covered by such an injunction. Lastly, it again indicated that it was free to sell commercial carpet before any negotiations for CarpetMaster's purchase ever occurred, and CarpetMaster now seeks to prevent any competition whatsoever.

Concerning CarpetMaster's new allegations, the court makes several observations. First, the effort to now enjoin Moller and Franze is beyond any prior relief sought by CarpetMaster, and Moller and Franze are not parties to this action.[30] Secondly, this application was clearly not included in Justice Graffeo's TRO nor was it encompassed by the district court's remand which was limited to the "new evidence" proffered by CarpetMaster in the videotape, transcript and Taylor Affidavit. Furthermore, Carpet-Master has conceded that there is nothing new in this evidence which alters the court's findings on their old theory, but urges an injunction on their new theory. The court declines to do so. A contrary ruling would permit CarpetMaster to continue to adjust their factual presentations and theories to continue a TRO which has now been in place for five months.[31]

For the reasons articulated herein, the court fails to find anything new in Carpet-Master's evidence and again recommends that the TRO be dissolved and a preliminary injunction denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.* See *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (*citing Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

---

29. *See* Docket No. 62.

30. Having raised this issue with Mr. Levine during the hearing, the court permitted the testimony. Now, having again reviewed all prior filings and the record of all prior proceedings, the court is satisfied that its recollection was correct and finds as a factual matter that this allegation is new and not encompassed by prior filings.

31. Even under the new theory, the facts clearly militate against CarpetMaster's position. The court credits the testimony of Moller and Franze, resolving issues of credibility against Taylor. Accordingly, Franze, who specialized in carpet installation, had no specialized knowledge about products, costs or discounts. Although Moller did have access to that information five months ago, it is ludicrous to argue that the industry has stood still. So too, Dupont has always had the ability to sell the same commercial carpet available to CarpetMaster, and both have to buy it at the same mills at competitive and negotiated prices. Lastly, CarpetMaster has offered no evidence demonstrating that Moller, Franze, Cassin or any other person has sought to utilize any prior information to steal any CarpetMaster customers.